(C. D. 1221)

THE PINEAPPLE GROWERS COOPERATIVE ASSOCIATION OF PUERTO RICO *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 14, 1950)

*Brown, Newsom & Cordova* (*Walter L. Newsom, Jr.*, of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*William J. Vitale*, special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; EKWALL, J., concurring

CLINE, Judge: This is a protest against the collector's assessment of duty on pineapple slips imported from Cuba at 25 per centum ad valorem under paragraph 755 of the Tariff Act of 1930 less the Cuban preferential of 20 per centum under T. D. 47232. It is claimed that the merchandise is entitled to free entry by virtue of paragraph 560

of the Tariff Act of 1897, the Commercial Convention between the United States and Cuba of 1903, 33 Stat., Part 2, p. 2136 (also known as the Cuban Reciprocity Treaty), section 316 of the Tariff Act of 1930, and the trade agreement with Cuba, T. D. 47232.

The pertinent provisions of said statutes and treaties are as follows:

TARIFF ACT OF 1930:

PAR. 755.  Seedlings, layers, and cuttings of apple, cherry, pear, plum, quince, and other fruit stocks, $2 per thousand; grafted or budded fruit trees, cuttings and seedlings of grapes, currents, gooseberries, or other fruit vines, plants or bushes, 25 per centum ad valorem.

SEC. 316.  CUBAN RECIPROCITY TREATY NOT AFFECTED.

Nothing in this Act shall be construed to abrogate or in any manner impair or affect the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or the provisions of the Act of December 17, 1903, chapter 1.

TARIFF ACT OF 1897:

SEC. 2.  That on and after the passage of this Act, unless otherwise specially provided for in this Act, the following articles when imported shall be exempt from duty:

*        *        *        *        *        *        *

PAR. 560.  Fruit-plants, tropical and semi-tropical, for the purpose of propagation or cultivation.

CUBAN RECIPROCITY TREATY:

ARTICLE I.

During the term of this convention, all articles of merchandise being the product of the soil or industry of the United States which are now imported into the Republic of Cuba free of duty, and all articles of merchandise being the product of the soil or industry of the Republic of Cuba which are now imported into the United States free of duty, shall continue to be so admitted by the respective countries free of duty.

TRADE AGREEMENT WITH CUBA, T.D. 47232:

ARTICLE I.

During the term of this Agreement, all articles the growth, produce or manufacture of the United States of America which would have been admitted free of duty if imported into the Republic of Cuba on the day of signature of this Agreement, and all articles the growth, produce or manufacture of the Republic of Cuba which would have been admitted free of duty if imported into the United States of America on the day of signature of this Agreement, shall be so admitted by the respective country free of duty.

At the trial it was stipulated as follows:

First, that the merchandise involved in this case consists of 4,032 bags of seedlings, pineapple fruit plants, covered by consumption entry 0594 dated October 21, 1946;

That the said plants are of a tropical or semitropical nature;

That the said plants are products of the soil and industry of the Republic of Cuba;

That the said plants were imported into Puerto Rico by the importer herein for, and actually have been used for the purpose of propagation and cultivation.

\* \* \* \* \* \* \*

\* \* \* that Consumption Entry #0146 of September 18, 1939; that Consumption Entry #0140 of September 7, 1940; that Consumption Entry #0153 of September 12, 1940; that an importation by the Palo Blanco Fruit Company in August, 1946, and that an importation in 1945 by the Palo Blanco Fruit Company, all of which cover pineapple slips imported from Cuba into Puerto Rico or the United States, were admitted free of duty under the provisions of the Tariff Act of 1897, the Cuban Reciprocity Agreement or Treaty of 1903, and the subsequent tariff acts which we have mentioned to Your Honor.

John M. Kohn, called as a witness for the plaintiff, testified that he has resided in Puerto Rico since 1912; that he has been engaged in fruit growing; that he ordered pineapple slips from Cuba in 1921 or 1922 through the Nitrate Agency; that he received about half a million; that he never heard of any duties being paid on them; that several different people got slips from Cuba prior to that time; that to his knowledge no duties were paid on them; that the normal growing season of pineapple in Puerto Rico from the date the slips are planted until the first harvest of fruit is made is from 12 to 18 months depending upon the time they are planted and other factors.

James P. Klein testified that he came to Puerto Rico about July 1, 1930, for the United States Department of Agriculture to work on marketing problems of fruit growers; that he became executive secretary for the Puerto Rico Fruit Exchange Cooperative Marketing Association and for The Pineapple Growers Cooperative Association, the plaintiff herein; that the latter was an association of all pineapple growers in Puerto Rico; that it was not only a marketing organization but worked for the spread of knowledge, better production methods, and grading of pineapples; that at the time he came to Puerto Rico there was a Cuban embargo on the exportation of pineapple slips to Puerto Rico; that after it became evident to him that the big problem in the pineapple industry was the small size of the pineapples due to the fact that the growers could not get any slips from Cuba, he worked to have the embargo lifted; that when the trade agreement of 1934 [T. D. 47232] was negotiated, a supplement was added to the effect that Cuba would lift the embargo; that the first attempt to bring in pineapple slips was made in 1936, but the Cuban Government blocked it; that he took the matter up with the State Department and was asked to go over to Havana with Mr. John Raybun, but again they were blocked by the Cuban Government; that in 1939 he went back by himself and managed to get 1,700,000 slips into Puerto Rico; that no United States customs duties were collected or asked; that it was generally known in the industry that pineapple slips imported

from Cuba into Puerto Rico were free of duty; that in 1936 he asked one of the officers of the Tariff Commission whether there was any duty on pineapple slips and was told there was none, which statement he reported back to the growers; that in 1940 he imported about two million slips and nothing was said in respect to duty by anybody and none was paid; that he went to Cuba in 1946 and got the shipment involved herein; that between 1940 and 1945 no importations were made because of the war; that in 1945 the Palo Blanco Co. made a small importation; that no duty was charged and none requested.

Counsel for the plaintiff stated that prior to the trial he had requested the collector at San Juan to be present at the hearing with the official records of all importations of pineapple slips from Cuba, but the collector informed him through counsel that those records, if they existed, had been destroyed and could not be found. However, later in the course of the trial counsel for the Government introduced into evidence as defendant's exhibit 2 a Report of Appraising Officer, customs Form 6431–A, dated October 16, 1922, covering entry No. 281 dated September 25, 1922. According to this report, the importation consisted of pineapple slips entered free of duty but advisorily classified under paragraph 753 of the Tariff Act of 1922 at 25 per centum ad valorem less 20 per centum for Cuban products. Counsel for the Government stated at the trial that no other official papers in regard to this entry could be found and there is no evidence in the record as to whether or not duty was assessed or paid.

Counsel for the plaintiff furnished the court with photostatic copies of certain pages from a number of different official reports of which the court ruled that judicial notice could properly be taken. The "Third Annual Report of the Governor of Porto Rico covering the period from July 1, 1902, to June 30, 1903" (Senate Document No. 26, 58th Congress, 1st session) contains the following statement (pp. 132–133):

* * * The cultivation of pineapples is receiving attention. The native varieties are delicious, but are too tender for export under present facilities for transportation. Hardier kinds are being grown, and shipments made during the season just closed gave encouraging returns. * * *

The "Fifth Annual Report of the Governor of Porto Rico covering the period from July 1, 1904, to June 30, 1905" (Senate Document No. 8, 59th Congress, 1st session) states (p. 11):

Pineapples, like oranges, have never been grown to any extent commercially until the last few years, although the Porto Rican pineapple is remarkable both for its size and quality. The reason why it has not been more generally grown for exportation appears to be that the large "Cabezona" and the small "Pan de Azucar," which were the only kinds of pineapples grown in Porto Rico, do not ship successfully. A great impetus has been given to the growing of pineapples by the successful results obtained and large profits realized by growers this year with varieties such as the "Red Spanish" and "Smooth Cayenne." * * *

The "Message from the President of the United States Relative to His Recent Visit to the Island of Porto Rico, Transmitting the Report of the Governor of Porto Rico" of December 11, 1906 (Senate Document No. 135, 59th Congress, 2d session), states (p. 27):

There has been considerable increase in the growing of pineapples, especially the varieties which proved best adapted for shipment to the United States markets. The Red Spanish variety, of which several million plants have been imported from Florida and Cuba, is the favorite with most of the planters and is the one chiefly grown for export.   *   *   *

The "Annual Report of the Governor of Porto Rico for the Fiscal Year Ending June 30, 1907," states that four million pineapple slips were imported from Florida and Cuba.

The "Report of the Governor of Porto Rico to the Secretary of War, 1919," states that the importation of pineapple slips from Cuba had been provisionally prohibited for fear of the pineapple weevil of Jamaica; that Mr. F. S. Earle, an agronomist and expert of the experiment station, had investigated, and on the basis of this report, the importation of slips from Cuba would be permitted under certain restrictions.

The "Report of the Governor of Porto Rico to the Secretary of War, 1920," states that the Palo Seco Fruit Co. was permitted to import 500,000 pineapple slips from Cuba.

There was received in evidence as plaintiff's exhibit 1, an excerpt from Bulletin No. 8, "Pineapple Growing in Porto Rico" by H. C. Hendricksen and M. J. Iorns, issued by the Porto Rico Agricultural Experiment Station, April 6, 1909, containing the following statement (pp. 24–25):

Just as in the Cabezona, there is considerable variation in the Red Spanish in the different parts of the island. It is not definitely known who brought in the first plants or where they were brought from, but in 1905 and 1906 large shipments were made from Florida and some from Cuba.   *   *   *

Plaintiff has furnished the court with an excellent brief in support of its contentions. It is claimed that the merchandise is entitled to free entry by reason of paragraph 560 of the Tariff Act of 1897, the Cuban Reciprocity Treaty of 1903, the trade agreement between Cuba and the United States of 1934, and section 316 of the Tariff Act of 1930. The Tariff Act of 1897 provided for free entry for "Fruit-plants, tropical and semi-tropical, for the purpose of propagation or cultivation." (Paragraph 560.) According to the stipulation of counsel the merchandise herein consists of plants of a tropical or semitropical nature which were imported and actually used for the purpose of propagation and cultivation. They would, therefore, have been free of duty, had they been imported when the Tariff Act of 1897 was in effect. Article I of the Cuban Reciprocity Treaty, which went

into effect on December 27, 1903, provides that all articles which are the product of Cuban soil or industry then imported free of duty into the United States should continue to be so admitted. Section 316 of the Tariff Act of 1930 provides that nothing in the act should be construed to abrogate or in any manner impair or affect the provisions of the Cuban Reciprocity Treaty. Similar provisions were contained in all tariff acts passed since the Cuban Reciprocity Treaty went into effect. The trade agreement with Cuba of 1934, T. D. 47232, provides that all articles which are the growth, produce, or manufacture of Cuba which would have been admitted free of duty if imported into the United States on the date of signature of the agreement, should continue to be so admitted.

Therefore, if pineapple slips were imported into the United States prior to December 27, 1903, at which time they would have been free of duty, the merchandise involved herein is entitled to free entry. In *Florida Avocado Growers Exchange* v. *United States*, 21 C. C. P. A. 548, T. D. 46987, it was held that the application of Article I of the Cuban Reciprocity Treaty was limited to goods which were actually being imported into the United States free of duty at the effective date of the treaty.

The chief issue herein is therefore whether or not pineapple slips were actually imported from Cuba prior to December 27, 1903. It appears from the "Fifth Annual Report of the Governor of Porto Rico covering the period from July 1, 1904, to June 30, 1905," *supra*, that pineapples had not been grown commercially in Puerto Rico until a few years prior thereto, as the native varieties did not ship successfully, but that a great impetus had been given to the growing of pineapples by the successful results obtained by growers with varieties, such as the "Red Spanish" and "Smooth Cayenne."

The "Third Annual Report of the Governor of Porto Rico covering the period from July 1, 1902, to June 30, 1903," *supra*, states that "Hardier kinds are being grown, and shipments made during the season just closed gave encouraging returns." Since "the season just closed" refers to the year 1903 and since the growing season for pineapples is from 12 to 18 months, the "hardier kinds" referred to must have been brought into Puerto Rico during the early part of 1902 or the latter part of 1901.

That these "hardier kinds" included the "Red Spanish" imported from Cuba is inferred from the statement in the "Fifth Annual Report" mentioned above and that in the "Message from the President of the United States Relative to His Recent Visit to the Island of Porto Rico, Transmitting the Report of the Governor of Porto Rico," *supra*, that "The Red Spanish variety, of which several million plants have been imported from Florida and Cuba, is the favorite

with most of the planters and is the one chiefly grown for export."
It appears from this that by 1906 the "Red Spanish" had proved to
be the best variety for shipment to the United States, indicating sev-
eral years' experience. Therefore, we may assume that pineapple
slips were imported from Cuba prior to the effective date of the
Cuban Reciprocity Treaty, December 27, 1903.

The record establishes that pineapple slips were imported from
Cuba up to 1919; that importation was provisionally prohibited in
that year for fear of the pineapple weevil; that importations were
made in 1920, 1921, and 1922; that thereafter the Cuban Govern-
ment imposed an embargo on the exportation of pineapple slips to
Puerto Rico; that importations were again made in 1939, 1940,
1945, and 1946. There is no evidence in the record that duty was
ever assessed upon such importations. The Report of Appraising
Officer (defendant's exhibit 2) shows an importation in 1922 advisor-
ily classified under paragraph 753 of the Tariff Act of 1922 at 25 per
centum ad valorem less 20 per centum for Cuban products, but there
is no evidence that duty was ever assessed or paid.

The trade agreement of 1934, T. D. 47232, provides that Cuban
articles "which would have been admitted free of duty if imported
into the United States of America on the day of signature of this
Agreement, shall be so admitted." On the day of signature of the
agreement, no pineapple slips were being imported from Cuba be-
cause of the Cuban embargo, but they would have been entitled to
free entry, had they been so imported.

We hold, therefore, that the merchandise herein is entitled to free
entry by virtue of paragraph 560 of the Tariff Act of 1897, the Cuban
Reciprocity Treaty (33 Stat. Part 2, p. 2136), section 316 of the
Tariff Act of 1930, and the trade agreement with Cuba, T. D. 47232.
The protest is sustained and judgment will be rendered in favor of
the plaintiff.

### CONCURRING OPINION

EKWALL, Judge: I concur in the result reached by my associates
for the reason that counsel have agreed that the importation consists
of "seedlings, pineapple fruit *plants*," [italics supplied] and that said
*plants* are of a tropical or semitropical nature. Otherwise, it would
seem to me that the early decision of *American Express Co.* v. *United
States*, T. D. 25211, G. A. 5645, holding that rooted rose cuttings
were not "rose plants" but rather cuttings of plants, and dutiable
under 252 of the act of 1897, would apply to pineapple slips, and that
such pineapple slips would not have been entitled to free entry on
the effective date of the Cuban Reciprocity Treaty of 1903.